NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2017-0151


DWIGHT K. STOWELL, JR.

v.

JEFFREY ANDREWS & a.

Argued: February 7, 2018
Opinion Issued: September 14, 2018


Cook, Little, Rosenblatt & Manson, pllc, of Manchester (Kathleen M. Mahan on the brief), and Sullivan & Worcester LLP, of Boston, Massachusetts (Nicholas M. O'Donnell on the brief and orally), for the plaintiff.


Schuster, Buttrey & Wing, P.A., of Lebanon (Barry C. Schuster on the brief and orally), for the defendants.


BASSETT, J. This is an appeal and cross-appeal of rulings made by the Superior Court (McNamara, J.) regarding the claims of the defendants, direct or beneficial owners of real property on Great Island, to deeded or prescriptive easements to traverse a footpath (the Circle Trail) over the Great Island lot owned by the plaintiff, Dwight K. Stowell, Jr. Great Island is on Lake Sunapee and lies partially in Newbury and partially in Sunapee. Stowell's lot is primarily in Newbury, although a small portion of it is in Sunapee. Some of the

defendants have Great Island lots in Newbury (the Newbury defendants), while others have Great Island lots in Sunapee (the Sunapee defendants). Because Great Island has no public roads, footpaths are used to get from one place to another on the island. The Circle Trail goes around the perimeter of the island.

In ruling on pre-trial cross-motions for summary judgment, the trial court decided that the Newbury defendants have deeded easements to use the Circle Trail as it crosses the Newbury portion of Stowell's lot. The court rejected the assertion that those easements were extinguished because the purpose for which they were created — to provide access to steamboats — became impossible to achieve once the steamboat wharves were destroyed in the hurricane of 1938. Stowell challenges that ruling in his cross-appeal. We affirm the trial court's determination.

Following a bench trial that included a view, the trial court ruled that: (1) only those Newbury defendants who testified at trial have prescriptive easements to use the Circle Trail over the Sunapee portion of Stowell's lot; (2) only the single Sunapee defendant who testified at trial has a prescriptive easement to use the Circle Trail over both the Newbury and Sunapee portions of Stowell's lot; and (3) Stowell has the unilateral right to relocate the Newbury defendants' deeded easements from the front to the back of his property. The defendants challenge those rulings in their appeal. We vacate the trial court's rulings regarding the defendants' prescriptive easements and Stowell's right to relocate the deeded easements, and we remand for further proceedings consistent with this opinion.

I.  Stowell's Cross-Appeal of the Trial Court's Summary Judgment Ruling

We first address Stowell's challenge to the trial court's summary judgment ruling that the deeded easements of the Newbury defendants were not extinguished when the steamboat wharves were destroyed. In reviewing the trial court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. Granite State Mgmt. & Res. v. City of Concord, 165 N.H. 277, 282 (2013). If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment. Id. We review the trial court's application of the law to the facts de novo. Cloutier v. State, 163 N.H. 445, 451 (2012).

A.  Relevant Facts

The trial court recited the following facts in its summary judgment order. In 1890, the original grantors owned the portion of Great Island located in Newbury. According to the 1890 "Plan of Cottage Lots on Great Island in Lake

Sunapee, N.H.," the original grantors subdivided the Newbury portion of the island into 45 lots. (Quotation omitted.) The plan did not identify any footpaths or wharves.

In the late 1800s and early 1900s, people used steamboats to travel to and from Great Island. Beginning in October 1892, the original grantors conveyed lots along the Newbury shore to various individuals through deeds. The first such deed, conveying Lot 16, contained the following easement clause:

> Hereby conveying to said grantee and his assigns the right of a foot path across any of the lots numbered on the before mentioned "plan" to reach the wharf or wharves that may be established on the shore of said Island, and reserving to ourselves and assigns the right of a similar foot path through or over the within named lot No. 16.

The first steamboat wharf on the Newbury side of the island, known as Auburn Landing, was built sometime after March 1893. The second steamboat wharf on that side of the island, known as Melrose Landing, was built sometime after October 1902.

Between 1893 and 1902, the original grantors conveyed 11 additional shoreline lots; after the Auburn and Melrose Landings were built, the grantors conveyed the remaining shoreline lots. Most of the deeds thus conveyed contained an easement clause. Although those clauses differ slightly, their substance is substantially the same: they convey to the grantee the right to cross all or some of the lots shown on the plan, by footpath, to reach the steamboat wharves. The lots to be crossed are variously referred to as the "lots in this range," "any of the lots," "the other lots," "all the lots north or south of this lot," "all the lots," "all the adjoining lots," and "all the lots on either side of these lots." (Quotations omitted.)

Steamboat service on Lake Sunapee ended by the 1930s, and the 1938 hurricane destroyed the steamboat wharves. The wharves were never rebuilt. After the wharves were destroyed and before electricity came to the island in the mid-1900s, staples such as bread, milk, and ice were delivered to island residents via boat; the delivery person would use the island's footpaths. The properties on Great Island now have individual docks for boats, which are used to travel to and from the island. The footpaths have been used to: travel to island gatherings; attend island meetings; visit neighbors; conduct island business; and access cottages in the case of an emergency. They also have been used for exercise and/or pleasure.

Before trial, motions were filed disputing whether the deeded easements remained viable after the steamboat wharves were destroyed. The trial court,

relying upon the plain language of the deeds and agreeing with the defendants, ruled that the destruction of the wharves did not extinguish the easements.

### B. Analysis

In his cross-appeal, Stowell argues that the Newbury defendants' deeds "established a limited right to cross certain lots around the perimeter of Great Island . . . for the unique purpose of reaching the steamboat wharves . . . to gain access to and from the island by steamboat." Thus, he contends, the "impossibility of purpose" doctrine extinguished the easements because "the purpose for the easement grant . . . is no longer possible." See Restatement (Third) of Property: Servitudes § 7.10, at 394 (2000) (setting forth the impossibility of purpose doctrine); see also Boissy v. Chevion, 162 N.H. 388, 393 (2011) (adopting the doctrine).

Under the impossibility of purpose doctrine, "[w]hen a change has taken place since the creation of a servitude that makes it impossible as a practical matter to accomplish the purpose for which the servitude was created," and modification of the servitude "is not practicable, or would not be effective, a court may terminate the servitude." Restatement (Third) of Property: Servitudes, supra § 7.10(1), at 394. The impossibility of purpose doctrine is "designed to eliminate meaningless burdens on land and is based on the notion that parties that create an easement for a specific purpose intend the servitude to expire upon cessation of that purpose." Boissy, 162 N.H. at 394 (quotation omitted).

Inquiry in an impossibility of purpose case "begins with determining the particular purpose of the easement in question." Id. (quotation omitted). "A provision in the easement instrument often indicates the parties' intent in this regard. When an easement purpose provision is ambiguous, courts examine the surrounding circumstances to ascertain the parties' intent and tend to favor the grantee with a broad interpretation." Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land § 10:8, at 10-18 to 10-19 (2016) (footnotes omitted). "Next, one must decide whether the contemplated purpose still exists. If not, the easement is considered to have expired." Boissy, 162 N.H. at 394 (quotation omitted).

Stowell argues that the trial court incorrectly determined that the Newbury defendants' deeded easements were not granted for the limited purpose of using the footpaths to reach the steamboat wharves so as to access the steamboats. He contends that the trial court's interpretation conflicts with the plain meaning of the easement clauses. Alternatively, he asserts that the easement clauses were ambiguous and that the trial court erred by failing to consider extrinsic evidence, which he contends "proved beyond dispute that the Easement Clauses were for steamship travel."

4

"The proper interpretation of a deed is a question of law for this court." Lynch v. Town of Pelham, 167 N.H. 14, 20 (2014) (quotation omitted). We review the trial court's interpretation of a deed de novo. Id. "In interpreting a deed, we give it the meaning intended by the parties at the time they wrote it, taking into account the surrounding circumstances at that time." Id. (quotation omitted). "We base our judgment on this question of law upon the trial court's findings of fact." Id. "If the language of the deed is clear and unambiguous, we will interpret the intended meaning from the deed itself without resort to extrinsic evidence." Id. "If, however, the language of the deed is ambiguous, extrinsic evidence of the parties' intentions and the circumstances surrounding the conveyance may be used to clarify its terms." Id.

In effect, Stowell argues that the language of the easement clauses, granting a right to cross, by footpath, all or some of the lots on the Newbury side of Great Island to reach the steamboat wharves, are "words of limitation" rather than "words of description." Barrett v. Kunz, 604 A.2d 1278, 1280 (Vt. 1992). We agree with the trial court that the easement clauses, by their plain language, were not intended to limit the grantees' use of the footpaths for a particular purpose. See Crabbe v. Veve Associates, 549 A.2d 1045, 1048 (Vt. 1988) (opining that "the rule regarding extinguishment by cessation of purpose should be applied only where easements are qualified by express limitations"); see also Lawley v. Abbott, 642 So. 2d 707, 708 (Ala. 1994) (holding that because the deed "unambiguously granted . . . an easement over the property . . . , without condition or reference to a specific purpose," the impossibility of purpose doctrine did not apply); Brock v. B & M Moster Farms, Inc., 481 N.E.2d 1106, 1107, 1108 (Ind. Ct. App. 1985) (finding that grantor intended easement for "a right-of-way for wagon, horses and footpassers" was "a general right of ingress and egress to his property, with no limitation to traffic used for agricultural purposes" (quotation omitted)), superseded on other grounds by statute as stated in Consolidated Rail Corp. v. Lewellen, 682 N.E.2d 779, 783 (Ind.), transfer granted and opinion vacated, 683 N.E.2d 595 (Ind. 1997).

As the trial court correctly observed, the easements do not require individuals to use a footpath only if they also intend to board a steamboat. Moreover, as the trial court also observed, "[t]he easement language does not limit what may be done once an individual reaches the location of a wharf via footpath or what footpath route must be used to get to a wharf." Further, given the lack of public roads on Great Island, and the fact that the footpaths are used to get from one place to another, we conclude that the easements were intended to convey to the grantees a right to use the footpaths for multiple purposes. The easement language, thus, merely describes a location, rather than limits the grantees' use of the footpaths to a particular purpose. See Boissy, 162 N.H. at 398 (petitioners conceded that, in a deed granting a right-of-way "to the ice pond," the reference to the ice pond "was a description of the location of the right-of-way and was not a statement regarding the easement's

purpose" (quotation omitted)).  Because the easements are for transit to the locations of the former steamboat wharves, rather than specifically to access the steamboats, they were not extinguished once the steamboat wharves themselves were destroyed.  Any issues raised in Stowell's cross-appeal that he did not brief are deemed waived.  See In re Estate of King, 149 N.H. 226, 230 (2003).

II.  The Defendants' Appeal

We next address the defendants' appeal of the trial court's rulings following the bench trial.  In reviewing a trial court's decision rendered after a trial on the merits, we uphold its factual findings and rulings unless they lack evidentiary support or are legally erroneous.  O'Malley v. Little, 170 N.H. 272, 275 (2017).  We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence.  Id.  Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence.  Id.  Nevertheless, we review the trial court's application of the law to the facts de novo.  Id.

On appeal, the defendants argue that the trial court erred when it: (1) decided that only those defendants who testified at trial had established that they had prescriptive easements; and (2) ruled that Stowell has the unilateral right to relocate the Newbury defendants' deeded easements.

A.  The Trial Court's Prescriptive Easement Determination

A party claiming to have a prescriptive easement must prove by a balance of probabilities twenty years' adverse, continuous, uninterrupted use of the land claimed in such a manner as to give notice to the record owner that an adverse claim was being made to it.  Jesurum v. WBTSCC Ltd. P'ship, 169 N.H. 469, 476 (2016).  "The nature of the use must have been such as to show that the owner knew or ought to have known that the right was being exercised, not in reliance upon the owner's toleration or permission, but without regard to the owner's consent."  Id. at 477 (quotation omitted).  Use is "adverse" when it is "trespassory," meaning that "it consists of a wrong which the fee holder can prevent or for which he can obtain damages by means of legal action."  Id. (quotations omitted).

The trial court determined that those Newbury defendants who testified at trial have prescriptive easements to use the Circle Trail over the Sunapee portion of Stowell's lot, and that the sole Sunapee defendant who testified at trial has a prescriptive easement to use the Circle Trail over both the Newbury and Sunapee portions of Stowell's lot.  The court ruled that, because "prescriptive rights are personal . . . , those [defendants] who did not testify

regarding their own personal use of the footpaths have failed to establish prescriptive easements." The court explained, "Although there was some testimony at trial that 'everyone' used the footpaths, these vague statements failed to specify when, for how long, or what portions of the footpaths were used by 'everyone.'"

The defendants argue that, by stating that "prescriptive rights are personal" and deciding that only testifying defendants satisfied their burden of proof, the trial court incorrectly determined that the easements at issue are "in gross." They contend that, in fact, the easements are "appurtenant" to the testifying defendants' lots. Stowell counters that the easements are not appurtenant easements because they are capable "of existence separate and apart from the dominant estate." Tanguay v. Biathrow, 156 N.H. 313, 315 (2007) (quotation omitted). He argues that the defendants' "prescriptive rights bear no relationship at all to the putative dominant estate[s]" in that "[n]ot a single [defendant] would be constrained in their ability to reach their own property without their prescriptive easements."

"The most important classification of easements differentiates between easements appurtenant and easements in gross." Bruce & Ely, supra § 2:1, at 2-2. Generally speaking, "'[a]ppurtenant' means that the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land." Shaff v. Leyland, 154 N.H. 495, 497 (2006) (quoting Restatement (Third) of Property: Servitudes, supra § 1.5(1), at 31). "'In gross' means that the benefit or burden of a servitude is not tied to ownership or occupancy of a particular unit or parcel of land." Id. at 498 (quoting Restatement (Third) of Property: Servitudes, supra § 1.5(2), at 31).

An appurtenant easement creates two distinct estates: the dominant estate, which is the land that benefits from the use of the easement; and the servient estate, which is the land burdened by the easement. Arcidi v. Town of Rye, 150 N.H. 694, 698 (2004). "The significance of the 'appurtenant' label is that ownership of the easement appertains, or is linked, to the dominant estate." Jacqueline P. Hand & James Charles Smith, Neighboring Property Owners § 7.07, at 158 (1988). "The easement is owned not by the grantee as an individual, but by the grantee qua owner of the dominant estate." Id. at 158-59. "Legally, the easement is one of the rights and privileges of owning the particular parcel of real estate identified as dominant." Id. at 159 (footnote omitted). Thus, "[a]n appurtenant easement is incapable of existence separate and apart from the dominant estate." Arcidi, 150 N.H. at 698. "The benefit of an appurtenant easement can be used only in conjunction with ownership or occupancy of a particular parcel of land." Id. (quotation omitted).

By contrast, "an easement in gross is owned by an individual person, with ownership of the easement not linked or tied to the ownership of any other interest in property." Hand & Smith, supra § 7.08, at 159. For an easement in

gross, there is a servient estate, but, "because the easement benefits its holder whether or not the holder owns or possesses other land," there is no dominant estate or benefited land. Arcidi, 150 N.H. at 698 (quotation omitted); see Hand & Smith, supra § 7.08, at 159. An easement in gross is "personal in the sense that it [is] not an incident of possession of a dominant tenement." Bruce & Ely, supra § 2:2, at 2-5 (quotation, ellipsis, and footnote omitted). An easement in gross "belongs to its owner independently of his ownership or possession of other land" and "vests only in the person to whom it is granted." Burcky v. Knowles, 120 N.H. 244, 247 (1980) (emphasis added).

"Whether an easement by prescription is appurtenant or in gross is determined by the use of the servient estate." Bruce & Ely, supra § 2:3, at 2-15. "If the prescriptive use was for the benefit of the possessor of a particular parcel, the easement is appurtenant." Id. (footnote omitted). "Otherwise, it is in gross." Id. To determine whether a prescriptive easement is appurtenant or in gross, courts may examine "whether the easement rights logically have 'free standing' value," meaning whether the rights are of value to anyone other than the owner of a particular lot. Hand & Smith, supra § 7.07, at 175 (Supp. 2017); see Ammer v. Arizona Water Co., 818 P.2d 190, 194 (Ariz. Ct. App. 1991) (explaining that courts "consider whether the easement would have any value apart from its use in connection with the land in question"). They may also examine "whether the adverse use took place in connection with and for the benefit of a particular parcel of land." Ammer, 818 P.2d at 194.

Whether the prescriptive easements at issue are "appurtenant" or "in gross" may be dispositive in this case. See Burcky, 120 N.H. at 247 (easement in gross "vests only in the person to whom it is granted" (emphasis added)). However, the trial court, in its narrative order, did not use the words "appurtenant" or "in gross." On the one hand, the court agreed with Stowell that "prescriptive rights are personal." This ruling could be consistent with a determination that the easements are in gross. See id. On the other hand, quoting case law, the court stated that "prescriptive easements, by their nature, can be utilized only on a tract-by-tract basis." Opinion of the Justices (Public Use of Coastal Beaches), 139 N.H. 82, 92 (1994) (quotation omitted). This ruling could be consistent with a determination that the easements are appurtenant to each lot. In light of these conflicting statements, we vacate the trial court's determination that the non-testifying defendants failed to establish that they have prescriptive easements and remand for the trial court to decide, in the first instance, whether the prescriptive easements are appurtenant or in gross. Moreover, on remand, in the event that the trial court determines that the easements are appurtenant, "[i]t is not necessary that every owner of property . . . testify as to his use." Shellow v. Hagen, 101 N.W.2d 694, 699 (Wis. 1960).

8

B.  The Trial Court's Determination that Stowell Had the Right to
Unilaterally Relocate the Deeded Easements

The trial court ruled that Stowell had the right to unilaterally relocate the Newbury defendants' deeded easements to use the Circle Trail over the Newbury portion of Stowell's property.  The court concluded that, because their deeds "are ambiguous as to the location of the footpaths" and "the footpaths have changed location over time," the Newbury defendants are entitled only to a reasonably convenient and suitable way across Stowell's property, rather than a right to cross his property at a specific location.  See Barton's Motel, Inc. v. Saymore Trophy Co., 113 N.H. 333, 335 (1973); see also Seward v. Loranger, 130 N.H. 570, 577 (1988).  The court determined that Stowell was entitled to relocate the trail because the purpose of the Circle Trail "is not for aesthetics, but rather for access," and there was no evidence that the relocated path "is not adequate for transit from one point to the other."

On appeal, the Newbury defendants agree that because "their deeds do not describe a specific location for their footpath[,] . . . they are entitled only to 'a reasonably convenient and suitable way.'"  However, they maintain that, at some point, it was agreed that the Circle Trail would pass directly in front of Stowell's home and that, therefore, Stowell may not now unilaterally relocate their deeded easements.  See Duxbury-Fox v. Shakhnovich, 159 N.H. 275, 282-83 (2009) (upholding "the trial court's implicit determination that . . . the owners of the dominant and servient estates mutually relocated the easement granted in the original deeds" based, in part, upon evidence that the subject right-of-way had been used "for over thirty years without issue" (quotation omitted)); see also Donaghey v. Croteau, 119 N.H. 320, 324 (1979) (observing that, where the location of a way was "left uncertain by the original deed," its continued use at a particular location was evidence of its intended location).

Stowell argues that he is entitled to relocate the deeded easements unilaterally pursuant to Section 4.8(3) of the Restatement (Third) of Property: Servitudes, which he urges us to adopt.  Section 4.83 provides:

> Unless expressly denied by the terms of an easement, as defined in § 1.2, the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not
>
> (a) significantly lessen the utility of the easement,
>
> (b) increase the burdens on the owner of the easement in its use and enjoyment, or

9

(c) frustrate the purpose for which the easement was created.

Restatement (Third) of Property: Servitudes, supra § 4.8(3), at 559.

"Defining the rights of the parties to an expressly deeded easement requires determining the parties' intent in light of circumstances at the time the easement was granted." Duxbury-Fox, 159 N.H. at 281 (quotation omitted). When, as in the instant case, "[t]he location and limits of the reserved way are not specified" in the deed, Gardner v. Webster, 64 N.H. 520, 522 (1888), "a reasonably convenient and suitable way across the servient land is presumed to be intended," Barton's Motel, Inc., 113 N.H. at 335; see Seward, 130 N.H. at 577.

The location of a "reasonably convenient and suitable way" presents "a question of fact to be determined by the trial court considering all the surrounding circumstances," which "include the location and uses of both dominant and servient estates and the advantage to be derived by one and the disadvantage to be suffered by the other owner." Barton's Motel, Inc., 113 N.H. at 335. "The trial court could also properly consider any information gained from its view of the premises." Id. Additionally, "where the location of a deeded right of way is uncertain, it may be clarified by the agreement of subsequent owners." Duxbury-Fox, 159 N.H. at 282.

The trial court found only that, before Stowell relocated it, the Circle Trail crossed the front of his property. The court made no findings as to how long the trail crossed the front of Stowell's property or whether it did so by mutual agreement. See id. Had the trial court determined that the Circle Trail crossed the front of Stowell's property by agreement, then, under New Hampshire common law, Stowell would not have the unilateral right to relocate it. See id. Under New Hampshire law, once the location of a deeded easement has been established, either by the language of the deed or by the subsequent acts of the parties, neither the owner of the dominant estate nor the owner of the servient estate may unilaterally relocate it. See Bruce & Ely, supra § 7:13, at 7-32; see also Duxbury-Fox, 159 N.H. at 282. "The reason for this rule is that treating the location as variable would incite litigation and depreciate the value and discourage the improvement of the land upon which the easement is charged." Stamatis v. Johnson, 224 P.2d 201, 203 (Ariz. 1950), modified on rehearing, 231 P.2d 956 (Ariz. 1951).

The general common law rule, that "once the location of an expressly deeded easement is established, whether by the language of the instrument creating the easement or by subsequent acts of the parties fixing on the ground the location of a general grant of a right of way, the site location may not be changed thereafter by either the owner of the dominant estate or the owner of the servient estate," absent consent or a reservation of rights in the instrument creating the easement, is the rule "[i]n the great majority of jurisdictions."

10

Davis v. Bruk, 411 A.2d 660, 664 (Me. 1980); see Herren v. Pettengill, 538 S.E.2d 735, 736 (Ga. 2000).  We have previously expressed this common law rule as follows:

> The use which the [dominant estate owner] may make of the way is limited by the bounds of reason, but within those bounds it has the unlimited right to travel over the land set apart for a way.  [The dominant estate owner] has no right to insist upon the use of any other land of the [servient estate owner] for a way, regardless of how necessary such other land may be to it, and regardless of how little damage or inconvenience such use of the [servient estate owner's] land might occasion to [the servient estate owner].  No more may the [servient estate owner] compel the [dominant estate owner] to detour over other land of theirs.

Sakansky v. Wein, 86 N.H. 337, 340 (1933).

However, "a handful of courts," AKG Real Estate, LLC v. Kosterman, 717 N.W.2d 835, 846 (Wis. 2006), have adopted Section 4.8(3) of the Restatement (Third) of Property: Servitudes, as Stowell urges us to do in this case.  See M.P.M. Builders, LLC v. Dwyer, 809 N.E.2d 1053, 1057 (Mass. 2004) (concluding "that § 4.8(3) of the Restatement is a sensible development in the law" and adopting it as the law in Massachusetts).  But see Kosterman, 717 N.W.2d at 846-47 (specifically rejecting the Restatement view).

"[P]roponents of the Restatement position argue that judicial intervention is necessary to rectify the problem of holdouts, who could otherwise single-handedly impede economic development."  Id. at 847; see Dwyer, 809 N.E.2d at 1057-59.  As a comment to the provision explains:

> [The Restatement provision] is designed to permit development of the servient estate to the extent it can be accomplished without unduly interfering with the legitimate interests of the easement holder.  It complements the rule that the easement holder may increase use of the easement to permit normal development of the dominant estate, if the increase does not unduly burden the servient estate.  This rule is not reciprocal. It permits unilateral relocation only by the owner of the servient estate; it does not entitle the owner of the easement to relocate the easement.  The reasons for the rule are that it will increase overall utility because it will increase the value of the servient estate without diminishing the value of the dominant estate and it will encourage the use of easements and lower their price by decreasing the risk the easements will unduly restrict future development of the servient estate.  In addition, permitting the

11

servient owner to change the location under the enumerated circumstances provides a fair trade-off for the vulnerability of the servient estate to increased use of the easement to accommodate changes in technology and development of the dominant estate.

Restatement (Third) of Property: Servitudes, supra § 4.8, comment f, at 563 (citation omitted).

"Conversely, opponents of the Restatement position contend that the uncertainty caused by judicial modification of easements does more to hamper economic development than does current law because the Restatement discourages investment by rendering property rights uncertain." Kosterman, 717 N.W.2d at 847; see MacMeekin v. LIHI, 45 P.3d 570, 578 (Wash. Ct. App. 2002) (observing that the Restatement approach has been criticized "on the ground that it permits undue interference with property rights"). Courts rejecting the Restatement view have opined that it is "a threat to the certainty of property rights and real estate transactions, . . . a catalyst for increased litigation, and . . . a means for purchasers of servient estates to reap a windfall at the expense of owners of dominant estates." Kosterman, 717 N.W.2d at 846; see Alligood v. LaSaracina, 999 A.2d 836, 839 (Conn. App. Ct. 2010) (deciding that "the attributes of the majority rule, namely, uniformity, stability, predictability and judicial economy, outweigh any increased flexibility offered by the Restatement approach").

We decline Stowell's invitation to adopt Section 4.8(3) because to do so "would mean altering [our] longstanding default rule" precluding unilateral relocation of an easement, Kosterman, 717 N.W.2d at 846, and would be inconsistent with the particular importance that New Hampshire places on private property rights, see Thomas Tool Servs. v. Town of Croydon, 145 N.H. 218, 220 (2000).

We are unable to discern whether the trial court relied upon Section 4.8(3) when it decided that Stowell had the unilateral right to relocate the Circle Trail (and the Newbury defendants' deeded easements). In explaining its decision, the trial court found only that relocating the trail to the rear of Stowell's lot would not frustrate the trail's purpose. Such a finding is consistent with, and might well have been based upon, Section 4.8(3). To the extent that the trial court relied upon Section 4.8(3), we conclude that it erred. Because we cannot determine whether the trial court would have reached the same decision without relying upon Section 4.8(3), we vacate its decision allowing Stowell to unilaterally relocate the deeded easements, and we remand for further proceedings. See Turner v. Shared Towers VA, LLC, 167 N.H. 196, 204 (2014).

C.  Relocation of the Prescriptive Easements

Finally, to the extent that the defendants assert that the trial court also erred when it ruled that Stowell had the unilateral right to relocate the prescriptive easements, we do not share their interpretation of the trial court's order.  See Edwards v. RAL Auto. Group, 156 N.H. 700, 705 (2008) (explaining that we interpret a trial court order de novo).  In the section of its narrative order discussing Stowell's right to relocate the trail, the court discussed only the Newbury defendants' deeded easements and did not address the defendants' prescriptive easements.  Thus, because the trial court does not appear to have ruled upon the issue, we express no opinion as to whether Stowell has the unilateral right to relocate the defendants' prescriptive easements.

Affirmed in part; vacated in part; and remanded.

LYNN, C.J., and HICKS, J., concurred.